## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**MICHELE C.,[1]**

      **Plaintiff,**

                                       **Case No. 1:21-cv-2051**

    **v.**                                    **Magistrate Judge Norah McCann King**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Michele C. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On February 9, 2018, Plaintiff filed her application for benefits, alleging that she has been disabled since October 15, 2015. R. 105, 122, 192–93. The application was denied initially

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

and upon reconsideration. R. 126−31, 133−35. Plaintiff sought a *de novo* hearing before an

administrative law judge. R. 136−37. Administrative Law Judge ("ALJ") Kimberly Varillo held

a hearing on November 20, 2019, at which Plaintiff, who was represented by counsel, testified,

as did a vocational expert. R. 35−87. In a decision dated February 3, 2020, the ALJ concluded

that Plaintiff was not disabled within the meaning of the Social Security Act at any time from

October 15, 2015, Plaintiff's alleged disability onset date, through the date of that decision. R.

15−29. That decision became the final decision of the Commissioner of Social Security when the

Appeals Council declined review on December 8, 2020. R. 1−6. Plaintiff timely filed this appeal

pursuant to 42 U.S.C. § 405(g). ECF No. 1. On June 1, 2021, Plaintiff consented to disposition of

the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the

Federal Rules of Civil Procedure. ECF No. 7.[3] On that same day, the case was reassigned to the

undersigned. ECF No. 8. The matter is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

Under the substantial-evidence standard, a court looks to an existing administrative

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account

whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent

such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

## B.  Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the

Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d

632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial

gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not

disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or

combination of impairments that "significantly limits [the plaintiff's] physical or mental ability

to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe

impairment or combination of impairments, then the inquiry ends because the plaintiff is not

disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of

impairments "meets" or "medically equals" the severity of an impairment in the Listing of

Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §

404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination

of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.*

at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC")

and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f).

If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not

disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC,

age, education, and work experience, can perform other jobs that exist in significant numbers in

the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do

6

so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

### III.   ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 33 years old on October 15, 2015, her alleged disability onset date. R. 26. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between that date, and the date of the decision. R. 17.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: left clubfoot status post multiple surgical interventions, left ankle arthritis, obesity, anxiety and depression. *Id*. The ALJ also found that Plaintiff's diagnosed asthma, obstructive sleep apnea, gastroesophageal reflux disease ("GERD") and history of migraines, as well as her alleged impairment of irritable bowel syndrome ("IBS"), were not severe. R. 18.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 18−20.

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work subject to various additional limitations. R. 20−26. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a customer service representative, banking/financial service, and as a mortgage clerk, financial services. R. 26.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs−*e.g.,* approximately 558,000 jobs as a sorter; approximately 469,000 jobs as a telegraph service rater clerk; and approximately 53,000 jobs as an addresser−existed in the national economy and could be performed by Plaintiff. R. 26−27. In making this finding, the ALJ rejected Plaintiff's challenge to these numbers, *see* R. 28−29, but also found that, in any

event, the numbers proposed by Plaintiff–*i.e.*, 2,396 jobs as a sorter; 247 jobs as a telegraph service rater clerk; and 4,355 jobs as an addresser–represented a significant number of jobs that Plaintiff could perform despite her lessened capacity. *Id.* The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from October 15, 2015, her alleged disability onset date, through the date of the decision. R. 29.

Plaintiff disagrees with the ALJ's findings at steps three, four, and five and apparently asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further. Proceedings. *Plaintiff's Brief,* ECF No. 11; *Plaintiff's Reply Brief*, ECF No. 19. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 18.

## IV.    DISCUSSION

### A.    Step Three

Plaintiff challenges the ALJ's finding at step three of the sequential evaluation, *i.e.*, that Plaintiff's impairments do not meet or medically equal a listed impairment; Plaintiff specifically refers to Listings 1.02A, 12.04, and 12.06. *Plaintiff's Brief*, ECF No. 11, pp. 17−24; *Plaintiff's Reply Brief*, ECF No. 19, pp. 6−7. Plaintiff's challenge in this regard is not well taken.

At step three, an ALJ considers whether the combination of the claimant's medically determinable impairments meets or equals the severity of one of the impairments in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). An impairment meets a listed impairment if it satisfies "'*all* of the specified medical criteria. An impairment that manifests only some of those

criteria, no matter how severely, does not qualify.'" *Jones,* 364 F.3d at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (emphasis in original). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the *overall* functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis added). "[T]he medical criteria defining the listed impairments [are set] at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id.* at 532 (emphasis in original) (quoting 20 C.F.R. § 416.925(a)). Although an ALJ is not required to use "particular language" when determining whether a claimant meets a listing, the ALJ's discussion must provide for "meaningful review." *Jones*, 364 F.3d at 505 (citing *Burnett*, 220 F.3d at 120). Accordingly, if the ALJ's decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing," "[t]his discussion satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review of the step three determination." *Id.*

As previously noted, Plaintiff challenges the ALJ's consideration of Listings 1.02A, 12.04, and 12.06, which the Court will address in turn.

### 1.    Listing 1.02A

Listing 1.02 addresses "major dysfunction of a joint(s) (due to any cause)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.02. This listing specifically provides as follows:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;[4]

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

*Id.*

In the case presently before the Court, the ALJ determined at step two that Plaintiff suffered the severe impairments of left clubfoot status post multiple surgical interventions, left ankle arthritis, obesity, anxiety, and depression. R. 17. The ALJ determined at step three that Plaintiff's impairments, whether considered singly or in combination, did not meet or medically equal, *inter alia*, Listing 1.02A, reasoning as follows:

---

[4] Listing 1.00B2b defines the term "inability to ambulate effectively" as follows:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*

> I have considered whether the claimant's left clubfoot status post multiple surgical interventions or left ankle arthritis meets or medically equals in severity listing 1.02(A), which pertains to major dysfunction of major peripheral weight-bearing joints. However, the evidence in this case, as discussed in further detail below, does not establish that the claimant is unable to ambulate effectively, as required under 1.02(A) and further defined by regulation.

R. 18.

Plaintiff disagrees with this finding, contending that the ALJ's analysis is conclusory and that the ALJ improperly failed to consider Plaintiff's obesity and inability to ambulate. *Plaintiff's Brief*, ECF No. 11, pp. 17−20 (admitting further, *inter alia*, that Plaintiff "does not use a cane or walker"); *Plaintiff's Reply Brief*, ECF No. 19, pp. 6−7.[5] Plaintiff's arguments in this regard are not well taken. As previously discussed, the ALJ is not required to use "particular language" when determining whether a claimant meets a Listing; the discussion must simply provide for "meaningful review." *Jones*, 364 F.3d at 505. Here, although the ALJ's statement specifically discussing Listing 1.02A at step three is brief, the ALJ also expressly considered Plaintiff's obesity at step three as follows:

> I have also specifically considered and determined that the claimant's obesity does not equal the requirements of any listing, either alone or in combination with other impairments in accordance with SSR 19-2p. As discussed herein, the claimant retains the ability to ambulate effectively. Furthermore, there is no other evidence of listing level severity, including of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine or cardiac functioning.

R. 19. At step four, when crafting the RFC determination, the ALJ considered Plaintiff's testimony and subjective complaints as well as objective evidence and medical opinion evidence regarding her ability to walk and her obesity. R. 21−26. For example, the ALJ noted that Plaintiff, notwithstanding her complaints about limitations and pain, reported that she can stand

---

[5] Plaintiff does not argue that she meets the criteria of Listing 1.02B. *See id.*

up to an hour and walk up to one mile, which the ALJ found to be consistent with sedentary work. R. 22. Although a May 2018 consultative examination revealed, *inter alia*, that Plaintiff had deceased range of motion in her left ankle and an antalgic left-sided limp in her gait, and could not walk on her toes secondary to left ankle pain, she was in no acute distress, could get on and off the examining room table without difficulty, could squat and heel walk, and drove herself to the appointment. R. 22–23. The ALJ also considered Plaintiff's clubfoot surgical history, noting that, "[o]verall, the record demonstrates that while the claimant has had surgical intervention for congenital clubfoot, she has healed well in relatively short time frames and without significant pain management." R. 23. The ALJ also went on to again consider Plaintiff's obesity and its effect on her ability to ambulate, among other things:

> The claimant's obesity has also been considered, in conjunction with the claimant's additional physical impairments, and her allegations of a limited ability to stand, walk, sit and lift and carry in conjunction with SSR 19-2p. Through much of the period, the claimant weighed 260 pounds, and was 5'5" tall (Ex. 19F). This corresponds with a body mass index ("BMI") of 43.26, indicative of obesity (Id.). Most recently, as of February 2019, the claimant weighed 279 pounds, with a BMI of 46.4 also indicative of obesity (Ex. 18F, p. 2). The restrictions on sitting, standing, and walking, as well as the postural limitations, adequately accommodate the claimant's pain and functional limitations in conjunction with her obesity.

R. 23. The ALJ further explained how the state agency reviewing physicians' opinions supported her findings regarding Plaintiff's ability to walk. R. 24–25. In other words, the ALJ specifically addressed Plaintiff's ability to walk as well as her obesity and cited to medical evidence to support her findings. R. 21–25. Reading the opinion as a whole, the Court concludes that the ALJ provided information sufficient to permit meaningful review. R. 18–19, 21–25; *see also Fullen v. Comm'r of Soc. Sec.*, 705 F. App'x 121, 124 (3d Cir. 2017) ("In this case, like *Jones*, the ALJ's decision, read as a whole, illustrates that the ALJ's conclusion that Fullen did not meet the requirements for any Listing . . . was supported by substantial evidence."); *Guzman v. Colvin*,

No. 15-6564, 2016 WL 4745175, at *5–6 (D.N.J. Sept. 12, 2016) (finding that "[t]he ALJ's explanation, while brief, is sufficient to permit meaningful review when considered in the context of the opinion as a whole").

Finally, although Plaintiff cites to other portions of the medical record that she believes support her argument that she cannot ambulate effectively and therefore meets or medically equals Listing 1.02A, *Plaintiff's Brief*, ECF No. 11, p. 19, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard]."); *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). This Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose its own factual determination. *See Chandler*, 667 F.3d at 359; *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Circ. 2014) (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

### 2.    Listings 12.04 and 12.06

The ALJ also considered Listing 12.04, which addresses depressive, bipolar, and related disorders, and Listing 12.06, which addresses anxiety and obsessive-compulsive disorders. R. 19−20. In order to meet either of these Listings, a claimant must meet the Listings' paragraph A criteria and either the paragraph B or paragraph C criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§§ 12.04, 12.06. The paragraph B criteria are met when a claimant has an extreme limitation of one, or a marked limitation of two,[6] of the following four mental functional areas: understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* at §§ 12.04B, 12.06B. The paragraph C criteria are met if the claimant's mental disorder is "serious and persistent[,]" *i.e.*, the claimant has a medically documented history of the existence of the disorder over a period of at least two years and there is evidence of both of the following: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder; and (2) marginal adjustment, *i.e.*, the claimant has minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of his or her daily life. *Id.*; *see also id.* at § 12.00G2.

In the present case, when determining whether Plaintiff's mental impairments met or medically equaled Listings 12.04 or 12.06, the ALJ explained at step three why she found that Plaintiff had only mild or moderate limitations in the four broad areas of functioning under the paragraph B criteria and why Plaintiff did not meet the criteria of paragraph C, reasoning as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

---

[6] A "marked" limitation means that the claimant is seriously limited her ability to function independently, appropriately, effectively and on a sustained basis in a specified area. *Id.* An "extreme" limitation means that the claimant is unable to function independently, appropriately, effectively on a sustained basis in a specified area. *Id.*; *see also id.* at § 12.00A2c 12.00F2d, e.

14

In understanding, remembering or applying information, the claimant has a mild limitation. The claimant reported in the record that she completed high school in regular education classes (Ex. 2E). She stated that she is able to pay bills, count change and handle a savings account, but that she has difficulty with spoken and written instructions (Ex. 3E). She reported hobbies including sewing in the record, and following patterns, and testified that she has no difficulties with reading books as a hobby (Ex. 3E, 6E; Hearing testimony). In the record, however, Kenneth Goldberg, Ph.D., and a consultative examiner reported the claimant appeared to have average intellectual abilities but that comprehending instructions may be difficult when anxious (Ex. 10F). While state agency reviewing psychiatric consultants Carmen Pineiro Ph.D., and Steven Reed, M.D., opined that the claimant would have moderate limitations in this area, this is not supported by the evidence, including the claimant's own report of daily activities including sewing and reading, without a problem (Ex. 1A, 3A). Given the totality of the evidence, the record supports that the claimant has no more than a mild limitation in understanding, remembering, or applying information.

In interacting with others, the claimant has a mild limitation. The claimant reported in the record and in testimony that she isolates (Ex. 4E; Hearing testimony). However, in the record Dr. Goldberg reported the claimant was cooperative, and she had normal speech and sustained a productive stream of conversation (Ex. 10F). The record also demonstrates that claimant was assisting her mother with taking her grandmother to medical appointments, bringing her children to and from school, going to the grocery store and children's activities, and she even drove to the consultative examination on her own (Ex. 3E; 6E; 10F; Hearing testimony). State agency reviewing psychiatric consultants Dr. Pineiro and Dr. Reed reported that the claimant would have a mild limitation in this area (Ex. 1A, 3A). Based upon the foregoing, the record supports a finding that the claimant has no more than a mild limitation in interacting with others.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant reported in the record that she has problems paying attention, when she is having issues with his anxiety, although she also reported daily activities including reading, child care and sewing (Ex. 3E; 6E; 10F; Hearing testimony). She reported she has problems finishing what she starts (Ex. 3E). On mental status examination with Dr. Goldberg, he reported that her attention and concentration are affected by her anxiety (Ex. 10F, p. 4). State agency reviewing psychiatric consultants Dr. Pineiro and Dr. Reed reported that the claimant would have a moderate limitation in this area (Ex. 1A, 3A). Accordingly, the record supports that the claimant has no more than moderate limitations in concentrating, persisting, or maintaining pace.

As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant reported in the record that stress affects her symptoms, such that she gets overwhelmed very easily, does not cope well, and ends up having

a panic attack (Ex. 3E). On mental status examination with Dr. Goldberg, however, the claimant had good insight and judgment (Ex. 10F). The record also demonstrates that the claimant has good insight and judgment, and her thoughts are lucid, logical and goal directed, and she was in casual, clean attire (Ex. 10F). In the record, the claimant reported significant daily activities, including child care, managing money, attending to housework and grocery shopping, visiting with her mother and grandmother, as well as attending the children's activities (Ex. 3E, 6E, 10F; Hearing testimony). State agency reviewing psychiatric consultants Dr. Pineiro and Dr. Reed reported that the claimant would have no more than a mild limitation in this area (Ex. 1A, 3A). As such, the record documents that the claimant has no more than a mild limitation in adapting or managing oneself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria as she does not have a serious and persistent mental disorder requiring a highly structured setting and does not have a minimal capacity to adapt to changes in her environment or demands that are not already part of her daily life.

R. 19−20. The Court finds no error with the ALJ's reasoning in this regard. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06; *cf. Orr v. Comm'r Soc. Sec.*, 805 F. App'x 85, 89 (3d Cir. 2020) ("Substantial evidence supports that finding [moderate difficulties in maintaining concentration, persistence or pace] because [the claimant] spent time online searching for auto parts; he read magazines; he watched a lot of politics and history on television; and he got six to seven hours of sleep a night, despite being awakened by discomfort in his leg.").

Although she challenges the ALJ's consideration of the paragraph B criteria,[7] Plaintiff does not explain why−nor does she even assert that−she has an extreme limitation in one of the four areas of mental functioning or two marked limitations in any of those four areas. *See Plaintiff's Brief*, ECF No. 11, pp. 20−24; *Plaintiff's Reply Brief*, ECF No. 19, pp. 6−7. Plaintiff,

---

[7] Plaintiff challenges only the ALJ's consideration of the paragraph B criteria. *Plaintiff's Brief*, ECF No. 11, pp. 20–24; *Plaintiff's Reply Brief*, ECF No. 19, p. 7 (referring to the arguments in *Plaintiff's Brief*).

who bears the bears the burden of proof at step three, therefore has failed to articulate why her impairments meet or medically equal Listings 12.04 or 12.06. *See Meyler v. Comm'r of Soc. Sec.*, 283 F. App'x 884, 889 (3d Cir.2007) (noting that the plaintiff bears the burden of proving at step three that his impairments meet or medically equal a listing); *cf. Shinseki v. Sanders*, 556 U.S. 396, 409−10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling caused harm.").

In short, and fairly reading the ALJ's decision as a whole, this Court concludes that substantial evidence supports the ALJ's finding that Plaintiff's impairments neither meet nor medically equal any listing, including Listings 1.02A, 12.04, or 12.06.

### B.    RFC

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to explain her reasoning, did not adequately account for all of Plaintiff's limitations, and improperly relied on outdated state agency evaluations. *Plaintiff's Brief*, ECF No. 11, pp. 24−26; *Plaintiff's Reply Brief*, ECF No. 19, pp. 8−10. This Court disagrees.

A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Chandler*, 667 F.3d at 361 ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d

Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is

supported by medical evidence, but is opposed by other evidence in the record" but "[t]his

discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported

reason" and stating that "the ALJ also has the discretion to include a limitation that is not

supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC to

perform a limited range of sedentary work, as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a) except the claimant can lift and/or carry 10 pounds, only occasional
> push and pull in left lower extremity; she can stand and/or walk for 2 hours and sit
> for 6 hours. Never climb ladders, ropes or scaffolds. Occasional balancing,
> stooping, kneeling, crouching and crawling. No unprotected heights. She can carry
> out a GED reasoning level 2 meaning she can carry out detailed but uninvolved
> written or oral instructions; and can deal with problems involving a few concrete
> variables in or from standardized situations.

R. 20. In making this determination, the ALJ detailed years of record evidence regarding

Plaintiff's physical impairments, including, *inter alia*, Plaintiff's hearing testimony and

statements made in a function report, including regarding, *inter alia*, her daily activities such as

preparing her own meals (during which she takes breaks after 20 minutes), making her children

breakfast, doing laundry, sweeping, and mopping (which includes taking breaks when doing

these tasks), and the fact that Plaintiff is capable of driving (although she tries to avoid it); the

ALJ also considered Plaintiff's subjective complaints, noting that even though Plaintiff alleges

that "she is unable to work due to anxiety, she also reported she has had these symptoms for

years, and previously was able to work" and that "while she reported pain and difficulties with

falls relative to her congenital clubfoot, she testified that the most recent surgery improved her

pain levels and she is no longer having falls" and she "reported standing for up to one hour, and

walking up to one mile . . ., which level of exertion is not inconsistent with the reduced range of sedentary work"; the fact that Plaintiff had a residual congenital clubfoot deformity, with a history of surgical intervention as a child, for which she underwent a cheilectomy and exostectomy of the left foot in May 2016, with tendo-Achilles lengthening on the left foot and cotton osteotomy with internal fixation; a May 2018consultative examination by Thomas Woloszyn, M.D., which revealed that Plaintiff was in no acute distress and was able to sit and stand, get on and off the examining table without difficulty; that she had an antalgic left-sided limp in her gait, but she reported she drove herself to the appointment; and that, although she had decreased range of motion in the left ankle and could not walk on her toes secondary to left ankle pain and decreased motion, she had a normal sensory examination, and could squat and heel walk; Plaintiff's June 2018 additional surgery in the form of a subtalar fusion/arthrodesis and the fact that, by November 30, 2018, she reported decreasing pain and improvement in her range of motion, and had completed physical therapy; the fact that, by January 2019, she reported only intermittent pain, without medication and that, overall, the record demonstrated that she had healed well in relatively short time frames and without significant pain management; the fact that the RFC's "restrictions on sitting, standing, and walking, as well as the postural limitations, adequately accommodate the claimant's pain and functional limitations in conjunction with her obesity"; and the fact that the ALJ also found partially persuasive the opinions of the state agency reviewing medical consultants that Plaintiff was limited to sedentary work with additional postural limits, which the ALJ explained "are reasonable to accommodate the claimant's impairments as to her left foot." R. 20–25.

The ALJ also considered years of record evidence regarding Plaintiff's mental impairments, including, *inter alia*, the facts that in April 2017 Plaintiff complained of stress and

was assessed with anxiety and depression and prescribed medication and continued with

medication management; during a May 2018 psychiatric consultative examination by Kenneth

Goldberg, Ph.D., Plaintiff reported, *inter alia*, that she could drive, she handled her personal

hygiene, cared for her children, handled money, handled ordinary household functions on a daily

basis, liked to sew and made outfits for her daughter, and spent time with her mother, including

accompanying her mother to her grandmother's medical appointments; while Plaintiff reported

that she no longer spent time with friends, she did spend time with family and had a good

relationship with her husband; upon mental examination, Dr. Goldberg reported that Plaintiff

appeared nervous throughout the interview, but was in casual and clean attire, was alert with an

appropriate affect, normal speech with thoughts that were lucid, logical and goal directed; that

although Plaintiff's attention and concentration were affected by her anxiety, she had average

intellectual abilities and Dr. Goldberg opined that Plaintiff could comprehend instructions when

calm, could sustain a productive stream of conversation, had normal insight and judgment, and

was cooperative. R. 23–24. The ALJ went on to explain as follows:

> Overall, the claimant's treatment for her severe mental health impairments has been
> no more than routine and conservative, consisting of medication management, only.
> Her mental status examination findings with independent consultative examiner Dr.
> Goldberg were generally unremarkable, with the exception of some mildly
> impaired concentration. Furthermore, the claimant reported a wide range of daily
> activities. She testified she has no problems concentrating when reading a book, as
> a hobby. She reported in the record, in testimony and to treating and examining
> providers, that she attends to housework, tends to child care, transports her children
> to and from school and their activities, and spends time with her mother and
> grandmother on a regular basis, socializing, and even joining her mother to take her
> grandmother to medical appointments. When considering the degree of treatment,
> as well as the claimant's daily activities, her allegation that she would be unable to
> work due to mental health impairments are inconsistent with the claimant's self-
> reported daily activities, and the record as a whole. As such, a limitation such that
> the claimant can carry out a GED reasoning level 2 meaning she can carry out
> detailed but uninvolved written or oral instructions; and can deal with problems
> involving a few concrete variables in or from standardized situations.

R. 24. In the view of this Court, this record contains substantial evidence to support the ALJ's RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186 F.3d at 429.

Plaintiff, however, challenges the ALJ's determination, arguing that "[t]he weight being given those [state agency reviewing medical consultants'] opinions is unwarranted" where those opinions were "based on only a partial record and issued years before the period at issue should not be seen as providing a showing that the [Plaintiff] is capable of sedentary work activity. Specifically, their reports were issued before her last surgery." *Plaintiff's Brief*, ECF No. 11, p. 26. Plaintiff's argument is not well taken. State agency physicians are experts in Social Security disability programs. SSR 96-6p. An ALJ may rely on a state agency physician's findings and conclusions even where there is a lapse of time between the state agency report and the ALJ's decision and where additional medical evidence is later submitted. *Chandler*, 667 F.3d at 361 (("The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required.") (emphasis in original) (citations omitted); *Wilson v. Astrue*, 331 F. App'x 917, 919 (3d Cir. 2009) ("Generally, an ALJ is required to consider the reports of State agency medical consultants; however, there is no requirement that an ALJ must always receive an updated report from the State medical experts whenever new medical evidence is available."). Accordingly, in this case, the ALJ did not err in finding the state agency psychological consultants' opinions persuasive simply because there was a lapse of time between their opinions and Plaintiff's June 2018 surgery (a subtalar fusion/arthrodesis). *Id.* Notably, Plaintiff fails to

explain how evidence regarding this surgery should result in new or different RFC limitations or an award of benefits. *See Plaintiff's Brief*, ECF No. 11, p. 26; *Plaintiff's Reply Brief*, ECF No. 19, p. 8 ("We particularly note that the Administrative Law Judge failed to account for the fact that [Plaintiff] underwent multiple surgical procedures, over one year apart, and that even if there was some improvement after the last surgery, she was still more limited than the residual functional capacity found for a period in excess of twelve months."); *see also Shinseki*, 556 U.S. at 409–10; *cf. Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the Court does not understand what argument Plaintiff has made here. Plaintiff has done no more than thrown down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court does not assemble arguments for a party from fragments.").

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does her consideration of the opinions of the reviewing state agency medical consultants.

### C.    Step Five

Plaintiff also raises a number of challenges to the ALJ's determination at step five, including her arguments that the hypothetical posed to the vocational expert was based on a flawed RFC determination, that some of the jobs identified by the vocational expert are obsolete, and that the alternative jobs identified by the vocational expert do not exist in significant numbers. *Plaintiff's Brief*, ECF No. 11, pp. 27–33; *Plaintiff's Reply Brief*, ECF No. 19, pp. 11–15. Plaintiff's arguments are not well taken.

22

At step five, an ALJ must decide whether the claimant, considering her RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Unlike in the first four steps of the sequential evaluation, it is the Commissioner who bears the burden of proof at step five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005)). "'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age, education, work experience and RFC.'" *Id.* at 205–06 (quoting *Rutherford*, 399 F.3d at 551). "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny*, 745 F.2d at 218. "Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy." *Zirnsak*, 777 F.3d at 614 (citing *Podedworny*, 745 F.2d at 218). "While 'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's impairments, the ALJ must include all 'credibly established limitations' in the hypothetical. *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations are limitations "that are medically supported and otherwise uncontroverted in the record," *Rutherford*, 399 F.3d at 554, and "[l]imitations that are medically supported but are also contradicted by other evidence in the

record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id.* (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

In the case presently before the Court, the hypothetical question posed by the ALJ to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 20, 69. The vocational expert responded that the jobs of sorter, telegraph service rater clerk, and addresser could be performed by such an individual. R. 70, 73–75. For the reasons discussed earlier in this decision, this hypothetical sufficiently captured Plaintiff's credibly established limitations and therefore supported the ALJ's determination at step five. *See Rutherford*, 399 F.3d at 554; *Podedworny*, 745 F.2d at 218. To the extent that Plaintiff's criticism of the hypothetical questions is that all her alleged impairments were not addressed, this criticism boils down to an attack on the RFC determination itself, *see Rutherford*, 399 F.3d at 554 n.8, which this Court has already rejected for the reasons previously discussed.

Plaintiff next argues that the alternative jobs of addresser and telegraph service rater are "obsolete[,]" although she concedes that the job of "nut sorter" "probably does actually exist." *Plaintiff's Brief*, ECF No. 11, pp. 28–29; *see also Plaintiff's Reply Brief*, ECF No. 19, p. 11. As to the first two jobs, Plaintiff contends that the Social Security Administration ("SSA") uses the

Dictionary of Occupational Titles ("DOT") for vocational information, which the SSA "has been trying to update" and which the SSA is "well aware" contains jobs that "are likely obsolete." *Plaintiff's Brief*, ECF No. 11, p. 28. Plaintiff specifically contends that the job of addresser is "both likely obsolete and yet reported as an alternative job in 9.5% of Step Five Denials." *Id.* (citations omitted). Plaintiff goes on to insist that the second job, telegraph service rater is obsolete because

> [i]n the world of today, really the world of the last forty years, telegrams have ceased to exist. There may still be telegrams sent as written confirmation of money transfers, but there is hardly a band of individuals sitting in offices counting the words of the telegram to determine charges. But that is what the DOT says the job entails and that is what the vocational witness insisted is still the case. (TR. 79)[.]

*Id.* at 28–29.

Plaintiff's arguments in this regard are not well taken. "[T]he Code of Federal Regulations specifically lists the DOT as a source of 'reliable job information[.]'" *Hearn v. Comm'r of Soc. Sec.*, No. CV 18-10538, 2019 WL 2710790, at *7 (D.N.J. June 27, 2019) (quoting 20 C.F.R. § 404.1566(d)). "Although Plaintiff may disagree with the relevance of the Dictionary of Occupational Titles ("DOT") in the modern-day work force, 'the DOT remains an appropriate source of occupational data.'" *Sanabria v. Comm'r of Soc. Sec.*, No. 2:15-CV-8963, 2017 WL 436253, at *4 (D.N.J. Jan. 31, 2017) (quoting *Coates v. Colvin*, No. CIVA. 14-0265, 2014 WL 4792199, at *4 (W.D. Pa. Sept. 24, 2014)); *see also Rush v. Berryhill*, Civ. No. 17-939, 2018 WL 4257930, at *1 n.1 (W.D. Pa. Sept. 6, 2018) ("[C]ourts in the Third Circuit that have addressed the matter have continued to find the DOT to be an appropriate source of occupational information and have declined to require ALJs and VEs to consult other sources in addition to the DOT.") (citations omitted). Accordingly, the ALJ did not err when she relied on the DOT at step five.

In addition, this Court and at least one other district court in this circuit have rejected the argument that the job of addresser is obsolete. *See Norabeth D. v. Kijakazi*, No. 1:21-CV-12874, 2022 WL 2952913, at *10 (D.N.J. July 26, 2022) ("Even assuming that some of the DOT occupations cited are obsolete, not all of them are. Two of the jobs cited by the ALJ—Addresser and Call Out Operator—have clear analogs in today's economy that are not obsolete. . . . Given these analogs, neither of these jobs can properly be described as obsolete. As such, the Court finds that the ALJ committed no error in relying on them (or the VE's opinion based on them) to form her conclusions at Step Five.") (citations omitted); *Byrd v. Berryhill*, No. CV 18-40, 2019 WL 999683, at *2 (W.D. Pa. Mar. 1, 2019) (finding that the ALJ properly relied on the DOT and vocational expert testimony and rejecting Plaintiff's argument that the job of addresser is obsolete). Notably, Plaintiff's counsel specifically asked the vocational expert at the hearing whether the job of addresser was obsolete and the vocational expert testified that the job still exists. R. 75−76.

Similarly, although Plaintiff goes on to contend that the job of telegraph service rater clerk is also obsolete, she concedes that the vocational expert testified that this job also still exists. *Plaintiff's Brief*, ECF No. 11, pp. 28−29 (citing R. 79). To the extent that Plaintiff continues to insist otherwise, she simply relies on her own unsupported assertion, *see id*., which is insufficient. *See Rush*, 2018 WL 4257930, at *1 n.1; *Sanabria*, 2017 WL 436253, at *4. In any event, even if this Court accepted for present purposes only that Plaintiff's arguments that the jobs of addresser and telegraph service rater clerk are obsolete, Plaintiff concedes that the job of sorter exists. *Plaintiff's Brief*, ECF No. 11, p. 29. "At the end of the five-step analysis, an ALJ need only establish that a claimant is capable of performing one job that exists in significant numbers in the national economy." *Penrose v. Comm'r of Soc. Sec*., No. 20-00011, 2020 WL

7640585, at \*7 (D.N.J. Dec. 23, 2020); *see also Danilowicz, v. Kijakazi*, No. 1:20-CV-01605, 2022 WL 19624, at \*8 (M.D. Pa. Jan. 3, 2022) ("The ALJ satisfied his step five determination by identifying at least one job that [the claimant] can perform existing in significant numbers in the national economy."); *Reed v. Comm'r of Soc. Sec.*, No. 1:16-CV-9099-NLH, 2018 WL 5617549, at \*6 (D.N.J. Oct. 30, 2018) ("Moreover, the finding that Plaintiff retained the RFC to perform one job that exists in significant numbers in the national economy met the ALJ's burden at step five to show that Plaintiff is not disabled.") (citations omitted). As discussed in more detail below, the job of sorter exists in significant numbers in the national economy and therefore satisfies the Commissioner's burden at step five.

Plaintiff contends that substantial evidence does not support the step five determination because the jobs of addresser, telegraph service rater clerk, and sorter do not exist in significant numbers in the national economy. *Plaintiff's Brief*, ECF No. 11, pp. 29–33; *Plaintiff's Reply Brief*, ECF No. 19, pp. 11–15. Plaintiff explains that the vocational expert (and, ultimately, the ALJ) improperly relied on the number of jobs found in the Standard Occupational Classification ("SOC") instead of the DOT, thereby resulting in an inaccurately inflated number of available jobs. *Id.* Plaintiff's arguments are not well taken.

The ALJ specifically addressed Plaintiff's argument, which Plaintiff raised in post-hearing briefing, as follows:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the

requirements of representative occupations, all of which are sedentary in exertion, and unskilled with a SVP of 2, such as:

| Occupation | DOT Code | Jobs In The National Economy |
|---|---|---|
| sorter | 521.687-086 | 558,000 |
| telegraph service rater clerk | 214.587-010 | 469,000 |
| addresser | 209.587-010 | 53,000 |

The vocational expert did indicate that her testimony regarding time off task and absenteeism are not addressed in the Dictionary of Occupational Titles (DOT) and that such restrictions were assessed based upon the expert's professional education, experience and research. I find this to be a reasonable explanation, because the vocational expert has appropriate experience to make such vocational determinations, and I further find that the testimony is not inconsistent with the DOT (SSR 00-4p).

The claimant's attorney representative Mr. Polonsky did not object to the vocational expert's qualifications, at the hearing. In a post-hearing memorandum, however, Mr. Polonsky, the claimant's attorney, consistent with his objections at the hearing, objected to the numbers of jobs proffered by the vocational expert. The claimant's representative asserts that the job numbers indicated by the vocational expert were not representative of the jobs available as to the particular DOT codes proffered, but instead were representative of the number of jobs available based upon an "OES" or "SOC" code grouping, which includes the particular job/DOT code, in addition to other jobs (Ex. 22E). In consideration of this assertion, the claimant's representative asserts the number of jobs available in the national economy, as to each *particular DOT code, only,* are as follows [emphasis added]:

| Occupation | DOT Code | Jobs In The National Economy by DOT CODE, only |
|---|---|---|
| sorter | 521.687-086 | 2,396 (Ex. 20E) |
| telegraph service rater clerk | 214.587-010 | 247 (Ex. 21E) |
| addresser | 209.587-010 | 4,355 (Ex. 19E) |

The claimant's representative argues that the jobs cited, as testified to by the vocational expert, when compared to the reports at Exhibits 19E, 20E and 21E, as outlined above, do not exist in significant numbers.

The Regulations state that I must base my decision on the preponderance of the evidence offered at the hearing or otherwise included in the record. (20 CFR 404.953). It is outlined in the Regulations, that if an issue in determining whether a person is disabled, is whether their work skills can be used in other work and the specific occupations in which they can be used, or if there is a similarly complex

issue, that we may use the services of a vocational expert or other specialist (20 CFR 404.1566 (d-e), and see also SSR 00-4p). The Regulations further allow that the agency will take administrative notice of reliable job information available from various governmental and other publications, including those which are sources vocational experts use in the formulation of their responses such as SkillTran or the Department of Labor Statistics, as indicated by the vocational expert. While the representative asserts that the Dictionary of Occupational Titles has not been updated since 1977, nevertheless, the agency is permitted to take administrative notice of this publication, under the Regulations.

To that end, Occubrowse, SkillTran, Department of Labor Statistics and the United States Publishing Data, as examples, qualify as sources a vocational expert may use, and the issues before me are issues in which the agency can use a vocational expert as outlined by the Regulations. The claimant's representative has not provided any authority that would allow me as the Administrative Law Judge hearing this case to disregard the Regulations concerning vocational expert testimony. Nor has Mr. Polonsky presented a vocational expert of his own, to challenge or refute the vocational expert's methodology or testimony, in this case, although he would certainly be entitled to do so.

Although Mr. Polonsky did not overtly argue that the Social Security Administration is bound by the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), relative to the applicability of Federal Rule of Evidence 702, by questioning the vocational expert's methodology, the substance of his argument tracks the proposition in Daubert that an expert's testimony requires valid scientific knowledge or a grounding in the methods and procedures of science. The policy of the Social Security Administration is that Daubert is inapplicable to proceedings before it. The Federal Rules of Evidence do not apply to proceedings before the Social Security Administration.

While I am able to take administrative notice of job data, I have decided to rely on the use of vocational expert testimony, and as Mr. Polonksy agreed to the qualification of Ms. Robertson as a vocational expert at the hearing, I overrule his objection as to the vocational expert testimony (20 CFR 404.1566(d)-(e)). Moreover, I note that despite his assertions in the hearing, and in the post-hearing memorandum, Mr. Polonsky is not a vocational expert. Most notably, Mr. Polonsky asserts that his proposed erosion of the number of jobs available in the national economy leads to a conclusion that the Commissioner has not fulfilled his burden at Step Five, to establish that there are a significant number of alternative jobs possible within a residual functional capacity. However, even if I accept Mr. Polonsky's argument, and assertion as to the number of jobs available relative to each specific DOT code for sorter, telegraph service rater clerk, and addresser, to wit: 2,396, 247, and 4,355, respectively (Ex. 19E, 20E, 21E), I find that these numbers nevertheless represent a significant number of jobs in existence, which would be possible within the residual functional capacity as determined at Finding No. 5.

R. 27−29. Plaintiff has not persuaded this Court that the ALJ erred in this regard. *See also Melissa B. v. Comm'r of Soc. Sec.*, No. CV 20-9029, 2021 WL 5578698, at *6 (D.N.J. Nov. 30, 2021) (rejecting argument of claimant's counsel, Attorney Alan Polonsky, that the vocational expert's reliance on SOC codes, which he alleged "inflate the actual number of jobs in the national economy," was erroneous and finding that "[n]umerous courts have permitted the use of SOC codes by VEs" and finding "no convincing reason to rule otherwise here") (collecting cases) (citations omitted); *Martell v. Colvin*, No. CIV. 14-1530, 2015 WL 1310269, at *7 (D.N.J. Mar. 24, 2015) ("Though not specifically listed, this Court finds that the SOC qualifies as 'reliable job information available from various governmental and other publications.'") (quoting *McKinnon v. Comm'r of Soc. Sec.*, No. 12–4717, 2013 WL 5410696, at *5 (D.N.J. Sept. 26, 2013)); *cf. Mariani v. Comm'r of Soc. Sec.*, No. 1:18-CV-14747, 2019 WL 5418092, at *7 (D.N.J. Oct. 23, 2019) ("Thus, the Court echoes what it has said before: It is not the province of this Court to reform the methodology that SSA VEs use to determine available and appropriate jobs in the national economy that match a claimant's RFC. Accordingly, because that methodology is the basis for Plaintiff's contention that the ALJ erred at step five, the Court finds Plaintiff's argument unpersuasive.").[8]

---

[8] Plaintiff also challenges the ALJ's alternative finding that even Plaintiff's lower estimate of the number of available jobs is significant, arguing, *inter alia*, that it is improperly to rely on *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) for the proposition that the existence of 200 jobs is a significant number of available jobs at step five. *Plaintiff's Brief*, ECF No. 11, pp. 32−33; *Plaintiff's Reply Brief*, ECF No. 19, pp. 13−15; *see also Craigie*, 835 F.3d at 58 ("In fact, based on Craigie's reduced functional capacity, but without consideration of all the symptoms described by Craigie, Szuhay indicated *there were about 200 jobs* in the light exertional category within his capabilities in his region. *This is a clear indication that there exists in the national economy other substantial gainful work which Craigie can perform.*") (citations omitted) (emphasis added). This Court, however, has continued to cite to *Craige* for that proposition, which supports the alterative finding of a significant number of jobs by the ALJ in this case. *See Williams v. Comm'r of Soc. Sec.*, No. CV 20-12254, 2022 WL 279838, at *10 (D.N.J. Jan. 31,

In short, the Court finds that the Commissioner has carried the assigned burden at step five of the sequential evaluation and concludes that substantial evidence supports the ALJ's determination in this regard.

## V.     CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  October 6, 2022                                     *s/Norah McCann King*
                                                              NORAH McCANN KING
                                                      UNITED STATES MAGISTRATE JUDGE

---

2022) ("Notably, the Third Circuit has found that as few as 200 and 569 jobs nationwide to be 'significant,' which is far fewer than the jobs available for Williams's representative occupations.") (citing, *inter alia*, *Craigie*, 835 F.2d at 58); *Pucciarello v. Colvin*, No. CV 15-3719, 2016 WL 3912851, at *18 (D.N.J. July 19, 2016).

31